IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

JAMES PERRY,

    Plaintiff,

v.                                    No. 10-1278

YOUNG TOUCHSTONE COMPANY,

    Defendant.

_____

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

*INTRODUCTION*

The Plaintiff, James Perry, initially brought this action in the Circuit Court of Madison County, Tennessee against the Defendant, Young Touchstone Company ("Young Touchstone") on October 1, 2010, alleging retaliatory discharge for pursuing claims under the Tennessee Workers' Compensation Law. The matter was removed to this Court on October 27, 2010. Before the Court is the Defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

*STANDARD OF REVIEW*

Rule 56 provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To survive summary judgment, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Pucci v. Nineteenth Dist. Ct., 628 F.3d 752, 759-60 (6th Cir. 2010) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))

(internal quotation marks omitted). "A genuine issue of material fact exists if a reasonable juror could return a verdict for the nonmoving party." Id. at 759 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A factual dispute concerns a 'material' fact only if its resolution might affect the outcome of the suit under the governing substantive law." Niemi v. NHK Spring Co., Ltd., 543 F.3d 294, 298-99 (6th Cir. 2008) (citing Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 451 (6th Cir. 2004)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Bobo v. United Parcel Serv., Inc., 665 F.3d 741, 748 (6th Cir. 2012) (quoting Anderson, 477 U.S. at 255, 106 S. Ct. 2505). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" In re Morris, 260 F.3d 654, 665 (6th Cir. 2001) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

*FACTS*

Young Touchstone, a division of Wabtec Corporation whose principal place of business is in Wilmerding, Pennsylvania, operates a facility in Jackson, Tennessee where it manufactures radiators and/or cooling systems for train locomotives and earthmovers. (D.E. 21-3 at 1 ¶ 2.) It operates another plant in Lexington, Tennessee. (D.E. 52-2 at 1 ¶ 1.) Perry was employed at Young Touchstone from October 31, 2005 to October 2, 2009 as an hourly at-will employee. (D.E. 21-3 at 1-2 ¶ 4.) He initially worked in the Fin and Tube Department until March 2006 before being transferred to the Cuprobraze Department, where he remained for the duration of his employment. (Id. at 2 ¶ 5.) In the Cuprobraze Department, Perry was a production worker building radiators.

2

(D.E. 21-9 at 10.)

In a performance appraisal dated May 2006, it was noted that Perry worked well with others and showed respect for management. (D.E. 38-3 at 5.) In January 2007, he received an "improvement needed" rating in the interpersonal relationships category, which measured "the extent to which an employee demonstrates the ability to cooperate, work and communicate with co-workers, supervisors, subordinates and/or outside contacts." (Id. at 4.) On a salary request form dated April 2007, his supervisor stated that "James is capable of running the entire [Cuprobraze] department" and that he had "the capabilities [and] knowledge of becoming a fine leader." (Id. at 6.) By the end of 2007, he received a "very good" rating in interpersonal relationships. (Id. at 3.)

On September 8, 2008, Perry sustained a work-related injury to his right hand, wrist and elbow, for which he received medical treatment for right carpal tunnel syndrome and right ulnar neuropathy. (D.E. 21-3 at 13.) The injury was reported to his employer on October 13, 2008. (Id. at 3 ¶ 11.) During this period, Perry was placed on light duty and, according to Human Resources Director Andy Deakins, missed only three days of work. (Id.) The Plaintiff reached the level of maximum medical improvement on June 9, 2009 and, on October 14, 2009, entered into a workers' compensation mediated settlement agreement with Young Touchstone for $29,733.94. (Id. at 13-14, 16.) In his affidavit, Perry stated that, while he was receiving medical treatment for his injury, "there was some friction between [him] and the Defendants HR Director, Andy Deakins and Mr. Warnick would hardly speak to [him]." (D.E. 28 at 2 ¶ 2.) He averred that he had no problems with Deakins prior to that time. (Id.) Deakins stated in his deposition that Perry complained about the light duty office-type jobs assigned to him by Young Touchstone in accordance with his physician's instructions. (D.E. 38-1 at 62-66.) It got to the point, Deakins recalled, that Perry no longer

returned his greetings. (Id. at 67.)

Plaintiff received a written unsatisfactory work quality warning in March 2009 for "failure to do first piece inspection"; built core with the wrong fin." (D.E. 21-9 at 82.) He disagreed with the employer's description of the violation, stating "there was no way I was wrong, I can't check the fins per inches or didn't run fins." (Id.) The Plaintiff also refused to sign the form because, he claimed, it was based on a lie.[1] (D.E. 28 at 2 ¶ 2.) No other negative items are contained in his personnel file. (D.E. 38-1 at 69-70.)

The Defendant instituted reductions in force (RIFs) three times in February, May and October of 2009 due to poor economic conditions. (D.E. 21-3 at 2 ¶ 7, D.E. 25 at 2 ¶ 5; D.E. 38-1 at 18.) It was up to Plant Manager Matt Warnick to determine the number of reductions to be made in each production department. (D.E. 21-3 at 2-3 ¶ 9, D.E. 25 at 1 ¶ 3.) According to Deakins, he and other department managers received instructions early in the year from Young Touchstone

---

[1] In response to the motion for summary judgment, Perry maintains that Deakins admitted in his deposition that "there is really no way to have come to the conclusion definitely that it was even Mr. Perry's fault as to what allegedly happened involving this product build" and that "Mr. Deakins frankly and candidly admitted that nothing was even followed up with regarding this written warning and that was the end of that matter." (D.E. 27 at 5.) Both statements, citing pages 91 and 92 of Deakins' deposition, are mischaracterizations of the HR director's testimony, which was as follows:

Q: . . . In fact that write-up did not lead to a change in his job, did it?

A: No, there was not.

Q: So, like life, mistakes can happen and he's not the only one where things like that happen when you're running parts or doing things like that?

A: No, a lot of people put their hands on the product. He's not the only one.

(D.E. 38-1 at 91-92.)

4

General Manager and Vice President Geoff Smith that workforce reductions must be made across the board. (D.E. 21-3 at 2 ¶ 7.) Thirty-seven employees were laid off on February 19, 2009 and 140 on May 26, 2009. (D.E. 21-4 at 1 ¶ 2.) More than one of the workers laid off in the May 2009 RIF was employed in the Cuprobraze Department. (D.E. 21-8 at 186.) Indeed, all second and third shift employees who worked in Cuprobraze were laid off prior to October 2, 2009. (D.E. 25 at 2 ¶ 7.) A total of 107 employees of Young Touchstone's Jackson facility were part of the RIF in 2009, ninety-seven of whom were hourly paid production workers. (D.E. 52-2 at 2 ¶ 5.)

On July 6, 2009, Perry was injured at work a second time and received medical treatment to his right leg, knee and arm. (D.E. 21-8 at 3 ¶ 12.) He was treated at a local clinic and released to return to work the same day without restrictions. (Id.)

In the October 2, 2009 RIF, one position was eliminated in the Cuprobraze Department and the Plaintiff had the least seniority in the department at the time. (Id. at 3 ¶ 10.) Employees in each department to be reduced were selected for layoff based on seniority or length of service. (Id. at 2-3 ¶ 9.) Perry was one of a total of eleven employees laid off as part of the October 2009 RIF. (Id.)

The Defendant's employee handbook provided that

[i]n the event of a necessary layoff, reduction of the work force will be based on plant seniority as long as the remaining associates possess the skills and abilities to meet production and operational standards.

The company may recall associates on layoff status to regular employment as needed. If the associate is recalled within 6 months of layoff, the associate will receive their previous accrued plant seniority and benefits.

(Id. at 11.) After six months, the employee is terminated from the system. (D.E. 21-8 at 96.)

Perry was aware of layoffs in other departments in October 2009. (D.E. 21-9 at 55.) His supervisor, Chris Ross, approached him on October 2, 2009 and told him Warnick wanted to speak

5

with him in his office. (Id.) Ross walked Perry and another employee who worked in the Fin and Tube Department to the plant manager's office and left them. (Id. at 55-56.) According to the Plaintiff, Warnick told him that he would be one of the first workers in his department to be called back in January because he was one of the main builders in Cuprobraze. (Id. at 57.) It was "like a promise." (Id.) Thereafter, the Plaintiff claims that he was also told he would be called back by Deakins, Ross and Human Resources Coordinator Melody Morgan. (D.E. 28 at 3 ¶ 4; D.E. 21-4 at 1 ¶ 1.) In addition, Perry avers that in January 2010 he phoned the plant to check on his recall date and was informed by Warnick again that he would be brought back. (D.E. 28 at 3 ¶ 4.) With respect to his workers' compensation settlement, the Plaintiff stated in his affidavit that

> I heard Andy Deakins say that my layoff was temporary and that I [was] going to be called back to work. I learned that my case was not what is called "capped," which I understood to mean that I had only one opportunity at this Benefit Review Conference [(BRC)] to obtain any amount of permanent disability compensation for this serious injury to my right dominant arm at my age and during what I knew was a bad economy with high unemployment. But, I kept thinking about what had been told to me by Matt Warnick and I was going to be called back to work soon, so I wanted to be fair and agreeable with my company since they were going to be bringing me back to my job, I thought based on what was promised to me when I was laid off. I would not have settled for only 37% to my arm, when a Court could award me up to a maximum of up to 60% for my arm, if I had known that the Defendant had lied to me about being recalled back to work.

(Id. at 4 ¶ 5.)

In responses to requests for discovery, Perry averred that, after his layoff,

> [i]n the opening session of my [October 14, 2008] work related injury claim at Young, Andy Deakins was in a conference room with myself, my attorney, Young's attorney and the [Department of Labor] Specialist, in which my attorney made some opening remarks regarding when I could expect to be called back because this would impact and be part of our determination of who we would negotiate the settlement of that claim -- at which time Mr. Deakins spoke up and stated "he will definitely be brought back when we start calling people back from this layoff" or words very closely [sic] to that effect. This led to me agreeing to a lower capped settlement because of these statements, as well as the earlier statements of Matt Warnick, even

6

though I realized it may be several months based upon my knowledge of the layoff and that it was a temporary financial decision.

(D.E. 21-7 at 5-6.)

In his deposition, Deakins related that, as to the fall 2009 RIF,

I do know I had a conversation with Matt Warnick and I said, Matt, James is laid off, because I knew we had a BRC coming up and whether he's subject to recall. He's permanent. If he's not working, he's going to be uncapped. He's not going to be limited to 1.5, and I remember having at least that much discussion with Matt at the time before it ever happened, and he said he understood. He said he understood, but again ultimately that choice is made by the plant managers and department managers as to who's going on the list.

(D.E. 38-1 at 77-78.) Deakins considered Perry to be a good employee. (Id. at 55.)

During the remainder of his employment with Young Touchstone, the Plaintiff did not seek additional treatment for the injury occurring on July 6, 2009. (D.E. 21-3 at 4 ¶ 13.) However, some three weeks after his layoff, the Plaintiff saw a doctor for his left knee, claiming it was related to the July 2009 injury. (Id. ¶ 14.)

According to Morgan, beginning in 2010 some production employees were called back to work based on need in particular departments. (Id. at 2 ¶ 5.) Warnick made the final determination as to which individuals would be recalled. (Id.) When there was a need for employees in a certain department, workers with the required skills and with the most seniority were asked to return. (Id.) Only three production workers were recalled within six months of layoff. (Id. at 2 ¶ 6.) Thirty-four employees were laid off and returned to work after expiration of the six-month period. (Id. at 2 ¶ 7.) Twenty-one of these were hired as temporary employees and thirteen were brought in as new hires. (Id.) Because they were not recalled within six months of layoff, the policy did not apply and rehires were not necessarily made based on seniority. (Id. at 2-3 ¶ 7.)

Warnick testified in his deposition that he generally advised employees being laid off that,

if they were the last out, they would be the first back within the six-month period referred to in the handbook. (D.E. 21-8 at 188.) He also informed them that he was unaware when anything would happen but that it would not be before the first of 2010. (Id.) Warnick denied telling Perry or any other employee that they would definitely be called back to work. (Id. at 189-90, D.E. 25 at 2 ¶ 4.) The plant manager stated that, while Perry was eligible to be called back, he was not Warnick's first choice. (D.E. 21-8 at 190-91.) Warnick explained that Perry complained about supervisors and co-workers, leading him to believe he had trouble getting along, and that he was concerned about the Plaintiff's refusal to accept responsibility for the violation that resulted in the March 2009 written warning. (D.E. 25 at 3 ¶ 12, D.E. 21-8 at 164.) The plant manager had also received comments about Perry to the effect that he complained often and was difficult to get along with. (D.E. 21-8 at 173-74.)

Warnick stated in his affidavit that if it was known that a particular employee had a workers' compensation injury, the company took extra precautions to ensure he was treated fairly and received all benefits and rights to which he was entitled. (D.E. 25 at 2 ¶ 9.) He originally listed Perry to be included in the May 2009 RIF based on the fact that he had the least seniority of those who remained in Cuprobraze at the time of the RIF. (Id.) Because he had recently returned from a workers' compensation injury, Warnick explained, the decision was made to "hold off." (Id. at 3 ¶ 9.)

No employees laid off from the Cuprobraze Department in 2009 were recalled within six months because the workload did not warrant it. (D.E. 21-4 at 3 ¶ 9, D.E. 25 at 3 ¶ 10.) On April 5, 2010, Bruce Ellison and Jarvis Partee were rehired as temporary employees in Cuprobraze. (Id. at 3 ¶ 10.) The two men were chosen for the positions by Warnick. (Id.) The plant manager stated in his affidavit that he hired Ellison and Partee because they were best qualified for the positions to

be filled based on their skills and abilities. (D.E. 25 at 3 ¶ 12.)

Morgan remembered Perry phoning her about being recalled. (D.E. 21-4 at 3 ¶ 11.) She stated that she told him, as she told others, that he was on the recall list. (Id.) Morgan asserted that, of thirty-seven production employees who returned after layoff as either temporary workers or new hires, six had previous workers' compensation claims. (Id. at 4 ¶ 13.) In October 2009, the number of production employees working for Young Touchstone numbered sixty-nine. (D.E. 38-2 at 3.) In 2010, the number ranged from eighty in January to 142 in December. (Id.) As of January 2011, the Defendant employed 138 production workers. (Id.)

## *ARGUMENTS OF THE PARTIES AND ANALYSIS*

"With significant exceptions, an employee or an employer may terminate an employment-at-will relationship at any time, with or without good cause." Conatser v. Clarksville Coca-Cola Bottling Co., 920 S.W.2d 646, 647 (Tenn. 1995). However, "an employee's ability to file a retaliatory discharge claim when his or her employment is terminated for filing a workers' compensation claim is recognized as a narrow exception to the employment at will doctrine." Newcomb v. Kohler Co., 222 S.W.3d 368, 389 (Tenn. Ct. App. 2006) (citing Clanton v. Cain-Sloan Co., Inc., 677 S.W.2d 441, 445 (Tenn. 1984)), *app. denied* (Jan. 29, 2007).

In cases of retaliatory discharge in Tennessee, a plaintiff must establish

(1) that an employment-at-will relationship existed;

(2) that the employee was discharged;

(3) that the reason for the discharge was that the employee attempted to exercise a statutory or constitutional right, or for any other reason which violates a clear public policy evidenced by an unambiguous constitutional, statutory, or regulatory provision; and

(4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

Kinsler v. Berkline, LLC, 320 S.W.3d 796, 800 (Tenn. 2010). "To meet the substantial factor requirement of [the] prima facie case, a plaintiff must show either direct or compelling circumstantial evidence of a causal connection between the workers' compensation claim and the termination." Crook v. Simpson Strong-Tie Co., Inc., Nos. 3:10-cv-00445, 2:10-cv-00099, 2:10-cv-00100, 2012 WL 123988, at *10 (M.D. Tenn. Jan. 17, 2012) (internal quotation marks omitted). "Proof of discharge without evidence of a causal relationship between the claim for benefits and the discharge does not present an issue for the jury." Goodbar v. Technicolor Videocassette of Mich., Inc., No. 09-2553, 2010 WL 5464796, at *10 (W.D. Tenn. Dec. 30, 2010) (quoting Anderson v. Standard Register Co., 857 S.W.2d 555, 558-59 (Tenn. 1993)), *recons. denied* 2011 WL 1637020 (W.D. Tenn. Apr. 29, 2011). The plaintiff must establish that his workers' compensation claim, rather than his injury, was the true or substantial reason for his termination. Thomas v. Werthan Packaging, Inc., No. 3:10-00876, 2012 WL 13954, at *2 (M.D. Tenn. Jan. 4, 2012) (internal quotation marks omitted).

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Idemudia v. J.P. Morgan Chase, 434 F. App'x 495, 500 (6th Cir. 2011) (citing DiCarlo v. Potter, 358 F.3d 408, 415 (6th Cir. 2004)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Id. (citing DiCarlo, 358 F.3d at 415). "For example, a facially discriminatory employment policy or a corporate decision maker's express statement of a desire to remove employees in the protected group is direct evidence of discriminatory intent." Brewer v. Cedar Lake Lodge, Inc., 243 F. App'x 980, 985 (6th Cir. 2007).

10

Perry offers the following deposition testimony of Warnick as direct evidence of discrimination:

> A: He would -- James [Perry] was on the list in May. I took him off after direct conversations with Mr. Deakins.
>
> Q: Tell me about that.
>
> A: I told -- explained to him that James was on the list, because I knew that James had had a workmens comp injury, and the decision was made between the two of us that it would be best if we did not have James on the list.
>
> Q: So you told Mr. Deakins in May that Mr. Perry had bee[n] put on the list because he had a workers comp injury?
>
> A: No.
>
> Q: That's what your testimony just was.
>
> A: No.

(D.E. 21-8 at 152-53.) A rather heated discussion ensued concerning what Warnick actually meant to say. In response to the instant motion, Perry's attorney vehemently insisted that the comma placed in the transcript between the words "list" and "because" by the court reporter should have been deleted as there was in fact no pause between the two words on the deposition audiotape. Counsel also advised the Court that a motion would be filed to request that the Court listen to the audiotape and order the transcript to be corrected by removing the comma.[2] The Plaintiff's brief was filed on

---

[2] Plaintiff's counsel, Mark Patey, also informed the Court that he spoke with the owner of the court reporting service, who agreed with him that the comma should not have been inserted and offered to provide the transcript at no charge. He offered no support for his assertion. However, Defendant attached to its reply the affidavit of Kathy May, owner and president of Alpha Reporting Corporation, who stated therein that she refused to agree to Patey's repeated demands to remove the comma. (D.E. 52-1 at 1 ¶ 3.) She acknowledged telling him she would not have included the punctuation mark, *"but for the fact that the witness clarified his answer EMPHATICALLY with the follow-up response."* (Id.) (emphasis added, but capitalization in original). Further, she agreed there was not a noticeable pause that would raise the inference that a comma should be inserted but added that she was not present at the deposition and there is much to be gleaned from seeing and hearing the testimony in person. (Id. at 2 ¶ 3.) When she

December 13, 2011 and, as of this date, no motion to correct the transcript has been filed.

Perry, of course, was not laid off during the May 2009 RIF. The finder of fact would, therefore, have to infer that the statement as interpreted by the Plaintiff supported the position that he was placed on the list for the October RIF because of an improper purpose. *See* Idemudia, 434 F. App'x at 500, *supra*; Brewer, 243 F. App'x at 985 ("The need to draw such inferences prevents these remarks from constituting direct evidence of discrimination."). In any case, Warnick's statement referred to a workers' compensation injury, not a claim. *See* Thomas, 2012 WL 13954, at *2, *supra.*

Consequently, Perry must rely on circumstantial evidence to support his claim. When circumstantial evidence of retaliation has been offered, the familiar burden-shifting analysis set forth by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) prescribes that the plaintiff must first demonstrate a prima facie case of retaliatory discharge based on a workers' compensation claim. Ellis v. Buzzi Unicem USA, 293 F. App'x 365, 368 (6th Cir. 2008). In a RIF situation, the plaintiff has an added prima facie burden to produce direct, circumstantial or statistical evidence that his status as a member of a protected class was a factor in his discharge. Crook, 2012 WL 123988, at *12 (citing Williams v. Tyco Elec. Corp., 161 F. App'x 526, 535 (6th Cir. 2006)). "A RIF occurs when business considerations cause an employer to eliminate one or more positions within the company." Id. Courts are to "avoid substituting the court's uninformed opinion for that of experienced [business] management." Daily v. Am. Founders Bank, Inc., 667 F. Supp. 2d 728, 736 (E.D. Ky. 2009) (citing

---

offered to credit the cost of the deposition, Patey told her to wait and he would get back with her. (Id. at 2 ¶ 5.) She did not indicate whether he contacted her again.

Brown v. Ferro Corp., 763 F.2d 798, 800 n.2 (6th Cir. 1985)).

If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to offer a legitimate, nondiscriminatory explanation for its actions. Neview v. D.O.C. Optics Corp., 382 F. App'x 451, 457 (6th Cir. 2010).

> Those reasons may involve the employee's own shortcomings, such as physical inability to do the job. The legitimate nonpretextual reason may also be one not related to this particular employee, but stemming from general business conditions, particularly as evidenced by the fact there were general layoffs involving, of course, other employees in no way involved in any retaliation.

Crook, 2012 WL 123988, at *11 (quoting Anderson, 857 S.W.2d at 559) (internal quotation marks omitted); *see also* Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 349-51 (6th Cir. 1998) (RIF is a legitimate nondiscriminatory business reason for eliminating plaintiff's position), *reh'g & suggestion for reh'g en banc denied* (Oct. 19, 1998); Southmayd v. Apria Healthcare, Inc., 412 F. Supp. 2d 848, 858 (E.D. Tenn. 2006) ("The Sixth Circuit has repeatedly held that an employer can establish a legitimate, nondiscriminatory reason for terminating a plaintiff by showing that the termination was part of a RIF."). Upon a showing by the defendant, the plaintiff bears the burden of establishing that the proffered reason was pretextual. Neview, 382 F. App'x at 457.

> The dispositive motion focuses on the prima facie case's causation element.
>
> In an effort to prove causation, a plaintiff can present circumstantial evidence in numerous forms, to include the employer's knowledge of the compensation claim, the expression of a negative attitude by the employer toward an employee's injury, the employer's failure to adhere to established company policy, discriminatory treatment when compared to similarly situated employees, sudden and marked changes in an employee's performance evaluations after a workers' compensation claim, or evidence tending to show that the stated reason for discharge was false. A plaintiff's subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge cannot, in and of themselves, create the requisite causal relationship. Moreover, an employee cannot rely on the mere short passage of time between the filing of a workers' compensation claim and subsequent termination to prove a prima facie case of retaliation.

Newcomb, 222 S.W.3d at 391 (internal citations omitted).

Here, one year separated Perry's 2008 workers' compensation claim and his layoff. This gap in time is insufficient to establish causation. *See* Crook, 2012 WL 123988, at *14; Nickles v. Law Offices of Donald D. Zuccarello, No. 3:06cv0702, 2008 WL 53689, at *6 (M.D. Tenn. Jan. 2, 2008). While the layoff occurred close in time to the settlement of his 2008 workers' compensation claim, the Plaintiff has failed to point the Court to any caselaw indicating such evidence satisfies the causation element. *See* Crook, 2012 WL 123988, at *14 ("Crook identifies no legal authority establishing that the timing of settlement of her claim is relevant to the causal analysis, let alone sufficient to meet it"); *see also* Vaughan v. Harvard Indus., Inc., 926 F. Supp. 1340, 1350 (W.D. Tenn. 1996) ("Finally, the proximity in time between plaintiff's termination and the settlement of his worker[s'] compensation claim does not satisfy the causation requirement."), *overruled on other grounds* Bratten v. SSI Servs., Inc., 185 F.3d 625 (6th Cir. 1999). Even taking into account the temporal proximity of the settlement of the 2008 claim and any claim relating to the 2009 injury, such evidence on its own falls short to establishing causation. *See* Newcomb, 222 S.W.3d at 391, *supra.*

The Plaintiff places primary emphasis on his allegation that he was promised by Young Touchstone management that he would be brought back in the first rehire group. It is undisputed that Defendant considered him eligible for recall. The evidence indicates that Warnick, Deakins and Morgan were aware Perry had filed at least one workers' compensation claim. Therefore, any promises to bring him back in the first rehire group in light thereof, if anything, validate Young Touchstone's assertion that he was not laid off in retaliation for exercising his rights under the workers' compensation laws. *See* Crook, 2012 WL 123988, at *15 (the fact that her employer designated plaintiff eligible for rehire in terminating her during RIF supported finding that workers' compensation claim did not play role in employer's decision to include her in reduction).

14

Moreover, Perry was apparently never even considered for the February 2009 layoff although he had a pending workers' compensation claim. If Warnick wanted to get rid of him because of his claim, he could have done so then. The decision was later made not to include the Plaintiff in the May 2009 layoff even though it is undisputed he had less seniority than any other employee in the Cuprobraze Department at that time and, therefore, would have been the appropriate person for layoff according to company policy. The fact that he was not laid off until October 2009 supports the conclusion that Young Touchstone was trying to accommodate him rather than looking for a reason to terminate him.

In addition, the Plaintiff has not so much as attempted to establish a pattern of discrimination on the basis of workers' compensation claims. *See* id. (plaintiff failed to identify evidence that workers' compensation claim influenced her RIF termination where "the statistics concerning [employer's] workforce reductions demonstrate no discernable pattern of discrimination on the basis of workers' compensation claims" and plaintiff did not "even attempt to identify such a pattern"). Finally, the Plaintiff's assertions do not constitute sufficient evidence of the expression of a negative attitude toward the employee. In Newcomb, the plaintiff offered corroborated testimony that, after he returned to work, his supervisor harassed him about his injury and his decision to sue the employer for benefits, as well as testimony of his former supervisor that he was instructed by management to keep an eye on the plaintiff because of the suit and to look for a reason to "get rid of him." Newcomb, 222 S.W.3d at 391-92. The Plaintiff's contentions are nowhere near those proffered in Newcomb and, instead, fall into the category of "subjective beliefs, mere speculation, or testimony that the employee can think of no other reason for the discharge" rejected by the

Newcomb court.³ *See* id. at 391. For these reasons, the Court finds Perry has failed to show a prima facie case of workers' compensation retaliation.

The true crux of Plaintiff's case appears to be not that he was laid off in retaliation for filing a workers' compensation claim but that he was not rehired because of it. That is, the "promise" was not kept. The Defendant maintains that, to the extent Perry is attempting to assert a retaliatory refusal to rehire claim, no such claim has been recognized under Tennessee law. *See* Crook, 2012 WL 123988, at *20 n.24 ("Sullivan also appears to argue that [her employer] retaliated against her by failing to rehire her in favor of another technician, Andrews. Sullivan provides no legal authority that Tennessee recognizes a claim for workers' compensation retaliatory failure to rehire."). Cases interpreting Tennessee law have considered claims of retaliatory refusal to rehire outside the workers' compensation context. *See* Southmayd, 412 F. Supp. 2d at 862 (plaintiff alleged former employer failed to rehire him after a RIF in retaliation for filing a charge with the Equal Employment Opportunity Commission).

Assuming for purposes of this motion that a claim for failure to rehire exists under Tennessee law with respect to workers' compensation, Perry cannot survive summary judgment. Simply put, there is no compelling evidence that any workers' compensation claim filed on his behalf was a substantial factor in Young Touchstone's failure to recall him. The Plaintiff has offered no evidence to contradict the Defendant's assertion that, after six months, it was under no obligation to recall laid off employees according to seniority or, indeed, to restore their employment at all. Nor does the Court have before it sufficient evidence to determine that his workers' compensation settlement

---

³Perry has averred there was friction between him and Deakins during his medical treatment period that had not existed before. However, it is undisputed Deakins did not make the decision to either lay him off or not rehire him. As for Warnick, the Plaintiff only stated that the plant manager hardly spoke to him. Perry offers no evidence to indicate how Warnick treated him prior to his 2008 workers' compensation claim.

16

would have been more beneficial to Young Touchstone, and less to him, if he were laid off and not rehired. In addition, the only statistical evidence of recalls of workers' compensation claimants reflects that, of thirty-seven production employees returned from layoff, six had prior workers' compensation claims. Perry has presented nothing to rebut this evidence. As noted above, any alleged promise to rehire Perry was made with full knowledge of his workers' compensation claim(s) and, if anything, reflects a lack of retaliatory motive. The fact that a promise to rehire was made does not render failure to honor the promise improperly retaliatory. Rather, the Plaintiff's position appears to the Court to be that the failure to rehire must have been retaliatory because he cannot advance any other reason. That is not sufficient to establish a prima facie case. *See* Newcomb, 222 S.W.3d at 391, *supra*. Based on the Court's finding that Perry has failed to establish a prima facie case of retaliation, it need not address Defendant's arguments concerning Plaintiff's capability to perform his job or his mitigation of damages.

## *CONCLUSION*

For the reasons articulated herein, the motion for summary judgment is GRANTED. The Clerk is DIRECTED to enter judgment for the Defendant.

IT IS SO ORDERED this 10th day of February 2012.

              s/ J. DANIEL BREEN
              UNITED STATES DISTRICT JUDGE